UNITED STATES DISTRICT COURT                    NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
J.P., by his parents D.P. and I.P.,                       :
                                                          :
                                Plaintiffs,               :
                                                          :     **MEMORANDUM & ORDER**
                    - against -                           :
                                                          :
THE NEW YORK CITY DEPARTMENT OF:                             CV 10-3078(ERK)(MDG)
EDUCATION                                                 :
                                                          :
                                Defendant.                :
-------------------------------------------------------------- X

KORMAN, J.:

On July 6, 2010, plaintiffs filed the instant action against the New York City Department

of Education ("DOE") under the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1415(i)(2)(A).  Under the IDEA, states that receive federal funding must provide

disabled children with a "free and appropriate public education."  20 U.S.C. § 1412(a)(1)(A).  A

free and appropriate public education mandated under the IDEA "must include special education

and related services tailored to meet the unique needs of a particular child, and be reasonably

calculated to enable the child to receive educational benefits." *Walczak v. Fla. Union Free Sch.*

*Dist.*, 142 F.3d 119, 122 (1998) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982))

(internal citations and quotation marks omitted).

The special education and related services are administered according to the

individualized education program ("IEP") developed for the disabled child, which the school

district must implement annually.  20 U.S.C. § 1414(d).  IEPs for disabled children in New York

are developed by local Committees on Special Education, which are composed of members

appointed by the school boards or trustees of school districts.  *Gagliardo v. Arlington Cent. Sch.*

*Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing N.Y. Educ. L. § 4402(1)(b)(1)).  In developing the

IEP, the Committee on Special Education must consider four areas: the student's (1) academic achievement, including level of intellectual functioning and knowledge and development in subject and skill areas; (2) social development, including degree and quality of relationships with peers and adults, feelings about self, and social adjustment to school and community environments; (3) physical development, including motor and sensory development and physical skills or limitations which pertain to the learning process; and (4) management needs, including the nature of and degree to which environmental modifications and human or material resources are required to enable the student to benefit from instruction. N.Y. Comp. Codes R. & Regs. ("N.Y.C.C.R.R.") tit. 8, § 200.1(ww)(3)(i).

Parents who disagree with the IEP developed for their disabled child may challenge it in an impartial due process hearing before an impartial hearing officer ("IHO"). *See* 20 U.S.C. § 1415(f); N.Y. Educ. L. § 4404(1). The IHO is appointed by the local board of education or state agency responsible for providing education to students with disabilities. *Id.* The IHO's decision may be appealed to a state review officer ("SRO"), whose decision may be challenged either in state or federal court. *See* N.Y. Educ. L. § 4404(2) & (3); 20 U.S.C. § 1415(g) & (i)(2)(A). Parents who feel the state has failed to provide their disabled child a free and appropriate public education may also, at their own financial risk, enroll their child in a private school and seek retroactive tuition reimbursement, provided that the private placement is appropriate and the proposed IEP is inappropriate. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370, 373-74 (1985); *Gagliardo*, 489 F.3d at 111; *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006).

The plaintiffs in this case appeal from the SRO's decision finding that (1) the DOE had offered J.P. a free and appropriate public education in the least restrictive environment under the IDEA, and (2) plaintiffs were not entitled to tuition reimbursement for their unilateral decision to

place their son J.P. at a private school. *See* Compl. ¶¶ 10-14, 21-22. Both parties moved for summary judgment on the administrative record.

## FACTS

At the start of the 2008-2009 academic year, the DOE classified J.P., who was a twelve years old, as a student with an emotional disturbance in need of special education services. Def.'s R. 56.1 Stmt. ¶ 1; T. 30. J.P. had been receiving special education services since preschool. T. 148-50.[1] From kindergarten through sixth grade, he attended West End Day School ("West End"), a small private special education school, where his class size ranged from six to eleven students. T. 148-49. During his last year at West End, J.P.'s class was composed of up to 10 students and three teachers. Def.'s R. 56.1 Stmt. ¶ 3. The other services J.P. intermittently received at West End included counseling, speech-language, and occupational therapy. *Id.* ¶ 4; DOE Ex. 9, at 1; DOE Ex. 10, at 1.

Around February 2008, plaintiffs began considering four private schools that West End had recommended for J.P. to attend in the 2008-2009 academic year, including York Preparatory School ("York"). T. 173-74. On February 18, 2008, plaintiffs signed a contract with York to enroll J.P. in the seventh grade and declined to participate in the school's Tuition Refund Plan.[2] T. 167-68, 171. For an additional fee, plaintiffs also enrolled J.P. in York's Jump Start program, which assists students who need enhanced support to survive a normal day. T. 213-14. Jump Start serves students with both documented and undocumented disabilities. T. 213.

J.P.'s mother testified that students enrolled in Jump Start meet with their Jump Start teacher for a half an hour every morning and for forty-five minutes at the end of every day, except on Fridays. T. 160. During these sessions, students go over homework assignments and

---

[1] The citations to the transcript are from the proceedings before the IHO.

[2] The Tuition Refund Plan was an insurance policy, in which parents could participate to insure their financial obligation to York under the contract in case of their child's absence, dismissal or withdrawal, at a premium rate of 4.2%. Pls.' Ex. C, at 1-2.

receive help with their studies and organizing their day.  *Id.*  Students also meet privately with their Jump Start teacher twice a week for two periods to go over any subjects they need additional help with that week.  *Id.*  The plaintiffs made their first nonrefundable payment of $4,000 under their contract with York on February 27, 2008.  T. 171.

On March 27th, the Committee on Special Education ("Committee") convened an annual review to develop an IEP for J.P.'s 2008-2009 academic year.  T. 15.  This meeting was attended by J.P.'s mom, the DOE's school psychologist, who also served as the district representative, a DOE general education teacher, a parent member from the DOE, and a DOE social worker.  T. 27-28.  The attendees from West End -- the Educational Director, a social worker and J.P.'s teacher -- participated via teleconference.  T. 27-28; 43-44.

In developing J.P.'s IEP, the Committee considered reports from West End on J.P.'s educational progress, counseling, and progress in occupational therapy and speech and language therapy.  T. 29; DOE Exs. 8-11.  These reports recommended that J.P. continue to receive speech-language therapy, occupational therapy, and remain in a therapeutic special education setting.  DOE Ex. 8, at 2; DOE Ex. 9, at 2; and DOE Ex. 10, at 2.  Dr. Dewey Aleem, the DOE school psychologist on the Committee, testified that J.P.'s psychological evaluation indicated that he had an overall score within the "high average range." T. 54.  That means, Dr. Aleem explained, that J.P. was "functioning above his peers cognitively, intellectually, and you would also expect him to be functioning above his peers because he is above average--high average, in terms of academic skills as well." T. 54-55.  Nevertheless, Dr. Aleem testified that J.P. "still had emotional issues," which needed to be considered with regard "to what extent his emotional issues would interfere with his ability to function as well." T. 58-59.

The IEP the Committee developed for J.P. recommended (1) a special class within a community school with a 12:1:1 placement, (2) individual and group counseling in a group of

three twice a week, and (3) speech and language therapy twice a week in a group of three. T. 30. A 12:1:1 class consists of 12 students with disabilities, a special education teacher, and a paraprofessional. T. 31. The IEP was designed to address J.P.'s difficulties with reading, writing, receptive and expressive language skills, math word problems and emotionally in dealing with his frustration and anxiety, in interacting with peers and functioning within the classroom setting. T. 34-41.

During the meeting, J.P.'s mother expressed interest in York as a placement for her son, but the Committee did not consider this program. T. 41-42.[3] The Committee did, however, consider a 12:1 placement, which it determined was "insufficient to address [J.P.'s] needs." T. 42. Dr. Aleem testified that the Committee "found that it would be almost impossible or very difficult for [J.P.] to function in a less restrictive environment than what" they recommended because of his academic and emotional difficulties. T. 67. J.P.'s mother did not express any concerns about the Committee's recommendations and the program offered during the meeting, although she "never really felt that [her] son was emotionally disturbed." T. 43, 152-53. At the conclusion of the meeting, J.P.'s mother was told that the placement officer would be sending her the recommended school for her son. T.153.

Prior to receiving the placement officer's recommendation, J.P.'s parents made two additional payments of $11,262.50 to York on April 30, 2008 and July 1, 2008. Pls.' Ex. B-1. Thus, by July 1, 2008, the plaintiffs' payments to York totaled a little more than half the tuition costs for the 2008-2009 school year. *Id.* They paid the York tuition in full by December 1, 2008 by making two additional payments of $11,262.50 on the first of October and December. *Id.*

---

[3] The DOE states, without contradiction, that the Committee would not have been able to recommend a placement at York because it is not a state certified school. *See* Def.'s Mem. of Law 12 n.2. Indeed, in *Stevens ex rel. E.L. v. N.Y.C. Department of Education*, Judge Cote observed that "York Prep is not approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities." 2010 WL 1005165, at *3 (S.D.N.Y. March 18, 2010).

J.P.'s father testified that he believed they could obtain a full refund of the tuition payments even though they declined to participate in the tuition refund plan, if York found another student to fill J.P.'s spot.  T. 178-80.

On August 13, 2008, the DOE notified the plaintiffs of J.P.'s placement in 12:1:1 class at Life Sciences Secondary School ("Life Sciences") with the related services that the Committee had recommended.  DOE Ex. 12.  Reginald Jean Baptiste was the special education teacher who taught this class.  T. 76.  Mr. Baptiste testified that at the start of the school year, the class consisted of six students, who were kept together for instruction in math, science, English and social studies and mainstreamed for foreign language and physical education.  T. 98, 124-25. Students in this class who demonstrated the strength or mastery of a particular subject could be mainstreamed for that subject.  *Id.*  Before mainstreaming a student, Mr. Baptiste would formally meet with the other teacher of the class and the assistant principal of instruction to discuss the student's capabilities and the mainstreaming opportunities available.  T. 98.  Sometimes the speech therapist and parents were also invited to the meeting.  *Id.*  The August 13th letter requested that the plaintiffs voice any concerns with the placement by August 27, 2008.  DOE Ex. 12.

J.P.'s mother responded with a letter, dated September 3, 2008, stating that she was arranging to visit the Life Sciences class to determine its appropriateness for her son.  DOE Ex. 13.  She also notified the DOE that, in the interim, J.P. would attend York.  *Id.*  After visiting Life Sciences, J.P.'s mom wrote another letter, dated September 12, 2008, notifying the DOE that the Life Sciences class was an inappropriate placement.  DOE Ex. 14.  She explained,

> First, [J.P.] would not be appropriately grouped in this placement.
> The students are lower functioning that [sic] [J.P.], and I do not
> feel that he would be challenged academically in this placement.
> In addition, we feel this program is too restrictive for [J.P.].  At
> this point in his academic career, he needs more opportunities to

> mainstream during the academic portion of the day, and he would
> not receive these opportunities in this program.

*Id.*  Finally, she noted that J.P. would continue at York and that they would seek reimbursement for the cost of his tuition.  *Id.*  This letter was the first time the plaintiffs had notified the DOE of their concerns with the recommended placement.  Def.'s R. 56.1 Stmt. ¶ 46.

### A.  Placement at York

York assigns about twelve to fifteen students to each class and places every student in general education classes, including the approximately one-third with a documented learning issue or disability.  T. 212, 249.  Students with learning disabilities are eligible to sign up for the Jump Start program, described above.  T. 212.  Mr. Hensen, J.P.'s Jump Start teacher, was not a certified special education teacher, although he had previously been certified.  T. 209.  Nor did he hold any other licenses as a speech language therapist or counselor.  *Id.*  He testified that J.P. made a lot of progress during the 2008-2009 academic year.  T. 245-46.  In his individual sessions with J.P., Mr. Henson focused on writing, J.P.'s most problematic subject area, and the one in which J.P. made the "most progress."  *Id.*; T. 220-21.  Mr. Henson testified that he "was able to show [J.P.] a few things that weren't in the curriculum" and help him learn more.  T. 246.  With regard to his social interactions, Mr. Henson testified that J.P.'s "way of dealing with people . . . is a little off putting sometimes," and raised "concern[s] at the beginning of the year that . . . things in the social realm weren't going to work out for him as well as they could for some students."  T. 220.  But "by the end of the year[,] there were no worries at all."  T. 246.

Aside from the Jump Start program, York did not provide J.P. with the recommended related services in his IEP, including speech-language therapy or individual or group counseling.  T. 192, 195, 263-64.  J.P.'s parents hired Dr. Leon Hoffman, a private therapist who had seen J.P. a few times at West End, to counsel J.P. individually.  T. 191-93, 195.  Dr. Hoffman stated that group therapy had been ineffective for J.P.  T. 207.

7

**B. Administrative Proceedings**

**1. Impartial Due Process Hearing**

On December 1, 2008, plaintiffs filed a request for an impartial hearing to request reimbursement for York's tuition expenses, totaling $49,050. DOE Ex. 1. The request alleged that J.P. had been denied a free and appropriate public education because his "IEP contained multiple procedural and substantive errors." *Id.*

After the impartial hearing, which commenced on May 28, 2009 and concluded on November 23, 2009, the IHO awarded plaintiffs tuition reimbursement for the 2008-2009 academic year. IHO Decision 9 (February 4, 2010). The IHO found that J.P. could be educated in a general education classroom with the use of supplemental aides and services. *Id.* Consequently, he found that the 12:1:1 placement offered was too restrictive for J.P. because (1) it "did not mainstream him to the maximum extent appropriate," (2) "would reinforce his emotional problems because of limited opportunities of mainstreaming," and (3) "would not benefit him academically [because] he was already functioning at his grade level." *Id.* Moreover, the IHO found that York was appropriate, and J.P. had made progress there. *Id.* Finally, the IHO found that although J.P.'s parents had first decided to place their son in a private school, *and then sought* public funding, they had cooperated with the Committee and were entitled to reimbursement. *Id.*

**2. Appeal to State Review Officer**

The DOE filed a state administrative appeal of these findings. Def.'s R. 56.1 Stmt. ¶ 59. In a decision dated April 29, 2010, the SRO reversed the IHO Decision. Compl. Ex. A. The SRO found that the Committee had developed J.P.'s IEP based on the information available to it at the time. He held that "retrospective information" that J.P. had progressed in a less restrictive program at York "should not be considered because it has no bearing on whether the IEP was

reasonably calculated to benefit [J.P.] at the time it was developed." *Id.* at 16. Furthermore, the SRO found that the Committee had "identified the student's needs, developed a special education program that addressed those needs, and" that the IEP could have been implemented at Life Sciences. *Id.* at 17. The information available to the Committee, the SRO noted, did not reflect that J.P. would have succeeded in a general education program, and indeed, the Committee had specifically determined that a less restrictive program would not provide sufficient support. *Id.* at 18-19.

The SRO also rejected J.P.'s mother's belief that the students in the Life Sciences class were lower functioning than J.P. *Id.* at 19-20. And regardless, the Life Sciences teacher addressed the differences in his students' academic ability by creating lesson plans with differentiated instruction and providing different assignments to students based on their skill sets. *Id.* at 20. Having found that the DOE had offered J.P. a free and appropriate public education, the SRO ended his inquiry there and did not consider whether York was appropriate for J.P. *Id.*

This appeal followed. Both sides have moved for summary judgment.

### STANDARD OF REVIEW

When reviewing administrative determinations under the IDEA, a district judge must base his decision on "the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) (internal quotation marks omitted); *see also* 20 U.S.C. § 1415(i)(2)(C). Review of the administrative decisions is strictly limited under the IDEA. *Grim*, 346 F.3d at 380-81 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 204-08 (1982); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (1998)). In conducting an independent review of the administrative record, judges may not "substitute their own notions of sound educational policy for those of the school

authorities which they review." *Rowley*, 458 U.S. at 206. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206, 208) (some internal quotation marks omitted).

Deference to the administrative record is particularly warranted here because the resolution in this case is "based solely on the administrative record." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). Where the SRO's final determination conflicts with the impartial hearing officer's decision, as here, "the earlier decision may be afforded diminished weight." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 n.2 (2d Cir. 2007); *see also A.C. ex rel. M.C.*, 553 F.3d at 171 (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)) ("We defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer.")(internal quotation marks omitted).

## DISCUSSION

Parents who feel that their disabled child has not been provided with a free and appropriate public education may, at their own financial risk, enroll their child in a private school and seek retroactive tuition reimbursement. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370, 373-74 (1985); *Gagliardo*, 489 F.3d at 111. The Supreme Court has established a three-step test for determining whether parents who challenge a proposed IEP and unilaterally decide to place their child in a private school are entitled to tuition reimbursement under the IDEA. *See Burlington*, 471 U.S. at 370; *see also Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15-16 (1993). Under the step one, the issue is whether the IEP formulated

for the disabled child was appropriate. *Carter*, 510 U.S. at 15. If the IEP violates the IDEA, under step two, the inquiry turns to the issue whether the private schooling obtained by the parents is appropriate for the child's needs. *Id.*; *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). Finally, "because the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006) (quoting *Burlington*, 471 U.S. at 374) (alterations in original); *see also Forest Grove Sch. Dist. v. T.A.,* 129 S. Ct. 2484, 2496 (2009) (holding that the court "retain[s] discretion to reduce the amount of a reimbursement award if the equities so warrant").

### A.  Burden of Proof

Although the IDEA is silent on the allocation of the burden of persuasion, the Supreme Court has held that "the burden of persuasion lies where it usually falls, upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005). The Supreme Court, however, declined to decide whether states may override this rule and statutorily place the burden always on the school district. *Id.* at 61-62. Effective October 14, 2007, New York statutorily placed on the school district "the burden of proof, including the burden of persuasion and burden of production," in an impartial hearing challenging the IEP, with the exception that a parent "seeking tuition reimbursement for a unilateral parental placement [has] the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Educ. L. § 44004(1)(c).

Absent any contrary instruction in the IDEA "federal courts in New York have placed the burden of disproving prong one of the Burlington/Carter test on the DOE and the burden of proving prong two on the parents." *N.Y.C. Dep't of Educ. v. V.S.*, 2011 WL 3273922, at * 12 (E.D.N.Y. July 29, 2011) (citing *R.E. v. N.Y.C. Dep't of Educ.*, 785 F. Supp. 2d 28, 44 (S.D.N.Y.

March 15, 2011) (assuming the burdens of proof without discussion); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 573 (S.D.N.Y. 2010); *L.K. v. Dep't of Educ.*, No. 09–CV–2266 (RMM)(LB), 2011 WL 127063, at *4 (E.D.N.Y. Jan. 13, 2011)); *see also J.S. v. Scarsdale Union Free Sch. Dist.*, -- F. Supp. 2d --, 2011 WL 5925309, at *30 (S.D.N.Y. Nov. 18, 2011); *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 641 n.29 (S.D.N.Y. 2011).

## B. Adequacy of the IEP

In reviewing the adequacy of the IEP, two issues must be considered: "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206-07).

### 1. Compliance with the IDEA Procedural Requirements

Although the procedural inquiry is not simply a mere formality, *Walczak*, 142 F.3d at 129, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA," *Grim*, 346 F.3d at 381. Procedural violations are significant under the IDEA "only if the procedural inadequacies--(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). The Supreme Court has stated that the congressional "emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all

of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 205-06.

The IDEA requires that parents of a child with a disability be given an opportunity "to examine all records relating to [their] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to [their] child, and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1). In New York, as noted earlier, the local Committee on Special Education develops a student's IEP. The committee must be comprised of the student's parents, a special education teacher, a school psychologists, a representative of the school district who is familiar with both special and general education within the district, and where the child is expected to participate in a general education environment, a general education teacher. 8 N.Y.C.C.R.R. § 200.3(a)(1); 20 USC § 1414(d)(1)(B).

Although plaintiffs argue that J.P. was denied a free and appropriate public education, in part because there were substantial procedural violations, they do not identify any specific procedural violations of the IDEA. *See generally* Pls.' Mem. of Law 8-13. Instead, their argument -- that the Committee's failure to consider a less restrictive program resulted in the denial of a free and appropriate public education, *Id*. at 9, 12-13, -- contests the substantive adequacy of the IEP, which will be discussed in the next subsection. *See P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118-19 (2d Cir. 2008) (noting that plaintiffs did not allege any procedural violations of the IDEA, but rather challenged whether the IEP complied with the IDEA's mandate that the student be educated in the least restrictive environment).

Nevertheless, the record also demonstrates that the DOE complied with the procedural requirements of the IDEA. The Committee was composed of all the appropriate and required individuals under federal and state law. J.P.'s mother was given an opportunity to participate

fully in the IEP meeting and to assist with developing her son's IEP. Unfortunately, she chose not to voice her view that J.P. did not require special education and should be mainstreamed. Contrary to the plaintiffs' argument, the Committee members cannot be expected to deduce from her suggestion of York as a possible placement that she felt J.P. should be moved to general education. *See* Pls.' Reply 4.

### 2. Substantive Adequacy of the IEP

To comply with the IDEA's substantive requirements, the student's IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. In developing the IEP, however, the school district is not required to provide "every special service necessary to maximize each handicapped child's potential." *Id.* at 199. The statute only guarantees an appropriate education, "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132. The purpose of the IDEA "was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192. The access provided to public education, however, must be "meaningful." *Id.* That is, the school district must provide "personalized instruction with sufficient support services to permit a child to benefit from that instruction." *Id.* at 203. The district fulfills its substantive obligations where the IEP it develops "is likely to produce progress, not regression," and "affords the student with an opportunity greater than mere trivial advancement." *Cerra*, 427 F.3d at 194-95 (citing *Walczak*, 142 F.3d at 130) (internal quotation marks omitted).

To avoid "impermissible meddling in state educational methodology" while conducting an independent review of a challenged IEP, a federal court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak*, 142 F.3d at 130. Deference is particularly important when assessing

an IEP's substantive adequacy because administrative agencies have "special expertise in making judgments concerning student progress." *Cerra*, 427 F.3d at 195-96 (holding that the determination that the disabled student "was unlikely to make progress under the proposed IEP is precisely the kind of educational policy decision a district court may not make absent objective evidence in the record suggesting that the SRO has reached an erroneous conclusion").

Although the IDEA does not require the IEP to "maximize the potential of handicapped children commensurate with the opportunity provided nonhandicapped children," *Rowley*, 458 U.S. at 200, it requires the IEP to maximize the education received in general education classrooms. Thus, to "the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 USC § 1412(a)(5)(A). This requirement stems from Congress' concern with the "apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes." *Burlington*, 471 U.S. at 373. Educating disabled children in regular classrooms is referred to as "mainstreaming." *Newington Bd. of Educ.*, 546 F.3d at 119.

Despite the IDEA's "strong preference" for mainstreaming children with disabilities "to the maximum extent appropriate" with their non-disabled peers," this "presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education." *Id.* (internal quotation marks omitted). Many courts have recognized the "tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much as circumstances allow." *Id.*

Plaintiffs challenge the substantive adequacy of J.P.'s IEP on two grounds: (1) the Committee did not consider a less restrictive placement in a general education class for J.P., and (2) the placement offered grouped J.P. with other students who were below his academic level. Pls.' Mem. of Law 9-10, 11 (citing T. 79-80, 117-18).

### a. Least Restrictive Placement

Plaintiffs argue that J.P. was denied a free and appropriate public education because the Committee failed to consider a less restrictive placement in a general education setting before offering a 12:1:1 placement for him. Pls.' Mem. of Law 9-10. Yet, no one at the IEP meeting, including J.P.'s mother and West End staff, recommended a general education placement. Def.'s Mem. of Law 9-10. Indeed, the West End attendees recommended J.P. continue in a special education class. *Id.* at 10. Moreover, the Committee considered and rejected a 12:1 placement because it determined that J.P. "needs a high degree of adult attention and intervention to attend to task and negotiate social interactions," and the 12:1 class would not "provide sufficient support." Def.'s Mem. of Law 10; DOE Ex. 3, at 12.

To determine whether the IEP appropriately placed the student in the least restrictive environment, the issue is "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Newington Bd. of Educ.*, 546 F.3d at 120. In considering this prong of the test, several factors must be considered, including: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Id.* If the disabled child's inclusion in a regular class excessively disrupts the class or requires so much of the teacher's attention that

other students are ignored, a general education placement may be inappropriate. *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1217 (3d Cir. 1993).

If the court determines that the school district was justified in segregating the child in a special education class, it must then decide whether the IEP "mainstreamed the child to the maximum extent appropriate." *Newington Bd. of Educ.*, 546 F.3d at 120. The factors considered under this two-prong test are "not exhaustive," and courts must "engage in an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it, ever mindful of the IDEA's purpose of educating children with disabilities, to the maximum extent appropriate, together with their non-disabled peers." *Id.* (internal quotation marks omitted).

The plaintiffs' argument that the Committee failed to consider a less restrictive placement for J.P. lacks merit. J.P.'s IEP explains that he was not placed in a general education environment because "severity of [his] emotional and behavioral difficulties requires his placement in a small self contained class." DOE Ex. 3, at 11. Given the information that was available in March 2008, when the Committee developed J.P.'s IEP, the special education placement offered for him was appropriate. Not only had J.P. been attending a special education school -- West End -- since preschool, his instructors' reports recommended that he continue in a therapeutic special education setting. *See* DOE Exs. 8-10. And although Dr. Aleem testified J.P. functioned above his peers cognitively and intellectually and was "high average, in terms of academic skills," T. 54-55, the Committee had to consider the effect of his emotional skills on his ability to function as well, T. 58-59.

The reports from J.P.'s instructors at West End indicate that he was an inflexible child that became easily frustrated and argumentative when he did not get his way. *See* DOE Ex. 8, at 1 ("[J.P.] is an anxious boy who has difficulty being flexible to adult and peer suggestions."); *Id.*

at 2 ("[J.P.] has difficulty accepting teacher's opinions and suggestions . . . . [J.P.] will often call out in class and will receive numerous reminders from the teacher to raise his hand and *allow others to answer*.") (emphasis added); *Id.* ("[J.P.] has a difficult time accepting consequences for his actions and will often try to argue his way out of the situation. When this occurs, [J.P.] can become emotional and needs teacher reminders to take a break. [J.P.] tends to be inflexible and controlling during social activities, which often results in conflict."); DOE Ex. 10, at 1 ("[J.P.] can be rigid and inflexible about following certain guidelines of an activity at times. [J.P.] evidences a poor frustration tolerance."); DOE Ex. 11 ("[J.P.] continues to struggle with rigidity in the classroom and is working on becoming more independent. He can become stuck on doing things 'his way' both with his peers and with his teachers. When asked to change something, either in academic activity or with his peers, [J.P.]'s response is to argue. He has difficulty coming to a compromise when involved in a competitive game with his peers and sometimes cannot move past the disagreement even after it is over. At these times [J.P.] can become teary, feeling frustrated that because he did not get exactly what he wanted, it is not 'fair.' . . . Being seen as competent and feeling that he is the best is important to [J.P.]. As a result, [J.P.] sometimes calls out in class to be sure he is heard."). Dr. Aleem testified that the Committee "found that it would be almost impossible or very difficult for [J.P.] to function in a less restrictive environment than what" they recommended because of both his academic as well as emotional difficulties. T. 67.

The reports all indicate that J.P. required a lot of attention from his teacher to negotiate his social interactions and needed to be reminded to not disrupt the class, but raise his hand to answer questions. The plaintiffs' argument that the defendant relies on *ipse dixit* reasoning, assuming the validity of the Committee's judgment is baseless. All the information provided by J.P.'s teachers and special services instructors supports the Committee's determination to place

18

J.P. in a special education class, in which the teacher would be able to specifically deal with his emotional needs. *See* Mr. Baptiste's Testimony, T. 91 ("[W]hen a student is feeling frustrated, . . . the student takes a short break so they [sic] could calm down . . . . [A]t the beginning of the school year, I always give a code, . . . to students when they are feeling a little frustrated, that they . . . use . . . and I will know it is time for them to get a little break, without letting anybody else know about it."). Not even J.P.'s mom suggested -- let alone insisted as she does now -- that J.P. should be placed in a general education setting because that was the least restrictive environment for him. In addition, a placement in a general education class would have been inappropriate in this case because the reports of J.P.'s West End instructors suggest that he would have required constant teacher reminders to not disrupt the class and attention when he became frustrated with the teaching style. His inclusion would have negatively impacted the education of the other students in the classroom.

Retrospective information that J.P. indeed did well in a general education program at York, as the SRO held, has no bearing on whether J.P.'s IEP was appropriate at the time it was developed based on the information available to the Committee. *See J.W. ex rel. J.E.W. v. Fresno Unified School Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) ("We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [Student] with a meaningful benefit.") (quoting *Adams v. State of Oregon,* 195 F.3d 1141, 1149 (9th Cir. 1999)). The Committee here fully complied with the IDEA's requirements and contrary to plaintiffs' argument, considered placing J.P. in a less restrictive setting but determined it would not meet his needs. It developed an IEP for J.P., based on the information before it, that was reasonably calculated to benefit him at the time it was developed.

### b. Appropriateness of the Placement

Plaintiffs argue that the Life Sciences placement offered J.P. was inappropriate because the students in the class functioned at a fifth or sixth grade level depending on the subject, whereas J.P. was high functioning and functioned at grade level.  Pls.' Mem. of Law 11 (citing T. 79-80, 117-18).  The DOE counters that J.P. fit the academic profile of most students in the Life Sciences class and was functioning at approximately the same level.   Def.'s Mem. of Law 15.

New York requires disabled children receiving special education "be grouped by similarity of individual needs" and that the range of their "academic or educational achievement . . . be limited to assure that instruction provides each student appropriate opportunities to achieve his or her annual goals."  8 N.Y.C.C.R.R. § 200.6(a)(3).  The composition of the special education classes are based on the students' similarities in terms of their "(i) levels of academic or educational achievement and learning characteristics; (ii) levels of social development; (iii) levels of physical development; and (iv) the management needs of the students in the classroom."  *Id.* § 200.6(h)(2).  The issue of whether a student has been grouped with functionally similar peers is one of educational policy, and where deference is due to the determination of administrative officers.  *W.T. & K.T. ex rel. J.T. v. Bd. of Educ.*, 716 F. Supp. 2d 270, 292 (S.D.N.Y. 2010) (holding that the court must "defer to the SRO's substantive determination that the broad range of ages and performance abilities in the class proposed by the DOE did not deprive" the student of a free and appropriate public education).

Mr. Baptiste testified at the hearing that the six students in his class were classified as "(l)earning disabled and emotional disturbance."  T. 79.  The students, at the time of the hearing, were functioning at the fifth grade level for math and reading.  T. 79-80; 117.  Mr. Baptiste was not sure what level the students were functioning at the beginning of the year and testified that he

would need to pull the students' IEPs for that -- an exercise he was not asked to perform.   T. 116-18.  The instruction in the class, however, "follow[ed the] seventh grade curriculum" and was broken down to the "fifth, sixth, and seventh grade levels" for each student based on their classification.  T. 119.  Students in this class who demonstrated the strength or mastery of a particular subject could be mainstreamed for that subject.  T. 98.

Because this issue is a matter of educational policy, I defer to the SRO's substantive determination that the Life Sciences class offered J.P. a free and appropriate public education despite whatever differences may have existed in the academic abilities of the students in the class.  As the SRO elaborated, and Mr. Baptiste -- the Life Sciences special education teacher -- explained, the lessons plans for the class were specifically designed to meet the needs of the six students in the class.  *See* T. 108 ("Every lesson plan is created with differentiated instruction in mind.  This is where we approach the planning to . . . [teach] the . . . entire class, but keeping in mind the different levels of students into the classroom. Or we have different work for different levels.").

Indeed, Mr. Baptiste spent considerable time during his testimony going through each of the goals in J.P.'s IEP and explained how he would address each one in class.  *See* T. 99-109. Furthermore, Mr. Baptiste testified that "based on [his] IEP, [J.P.] fits the academic profile of most of the students who [are] currently in my classroom."  T. 99.  But if J.P. had the skills and emotional ability to handle a mainstream class for a subject, Mr. Baptiste would have conducted a meeting with J.P.'s other teachers, the assistant principal, and possibly his parents and therapist, to discuss his capabilities and placing him in a mainstream class.  T. 98.

Moreover, as discussed *supra* p. 18, J.P. required a substantial amount of teacher attention to help manage his emotions and needed constant reminders about his disruptive behavior in the classroom.  Under New York Law, the Committee had to consider this factor and

weigh it against J.P.'s academic abilities to determine what type of class would be best suited to his needs. The Committee's determination is clearly an issue of educational policy on which I must defer to the expertise of SRO and the special education teacher that J.P. would have been appropriately grouped in the Life Sciences class and would be able to obtain educational benefit there.

In sum because of the structure of this class and the opportunity available to mainstream J.P. during the year, the SRO did not err in holding that the Life Sciences placement was a free and appropriate public education for J.P. despite whatever discrepancies may have existed in the functioning levels of the other students in the class. As the Second Circuit has emphasized, the IDEA does not guarantee "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132. It simply requires that the disabled child be provided "personalized instruction with sufficient support services to permit a child to benefit from that instruction." *Rowley*, 458 U.S. at 203. The Life Sciences class would have offered J.P. educational benefit that was likely to "produce progress, not regression," *Cerra*, 427 F.3d at 194-95, even if J.P.'s progress there would not have been as great as it was at York.

Because this conclusion is itself sufficient to resolve the motions, it is unnecessary to analyze whether York was an appropriate placement for J.P. Although, I observe that Judge Cote, my able Southern District colleague, has found -- in a similar case -- that York's Jump Start program is not an appropriate placement for a special needs student because it does not provide a curriculum or individual goals for the student, or any specialized services, such as occupational or speech therapy, that the student had previously needed and received. *Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, 2010 WL 1005165, at *9 (S.D.N.Y. March 18, 2010). Indeed, she noted that the Jump Start teacher "apparently served as a general trouble-shooter and tutor" for the student. *Id.*

Nevertheless, I do think it is necessary to discuss the issue of whether even if J.P.'s parents were otherwise entitled to reimbursement, equitable considerations would preclude it.

## C. Equitable Considerations

### 1. Lack of Good Faith

Defendant argues correctly the plaintiffs never intended to enroll J.P. in a public school and only went through this process hoping to get an award of tuition reimbursement. Def.'s Mem. of Law 20-23. Even the IHO, who ordered tuition reimbursement, recognized that the plaintiffs never intended to send J.P. to a public school. J.P.'s parents declined to participate in York's tuition refund plan on the assumption that they could obtain a refund if York was able to find a replacement to fill J.P.'s slot. T. 179. Thus, they paid over half York's tuition before even receiving the DOE's placement offer.

Moreover, J.P.'s parents did not engage in the proceedings before the Committee, which was designed to formulate an IEP, in good faith. Perhaps because they were so advised or because of their prior experience with the system, they did only the bare minimum necessary to give the appearance of their good faith participation in the process -- *physically* being present at the IEP and visiting the Life Sciences class. If they had not done so, they would have plainly forfeited any right for reimbursement for their private placement. Nevertheless, they failed to notify the Committee that they had already signed a contract with York and made a nonrefundable deposit prior to the IEP meeting. Moreover, J.P.'s mother did not fully participate in the IEP meeting, as is demonstrated by her failure to voice her view that J.P. did not belong in special education. Her attitude as an observer in the process rather than an active participant displays an utter lack of good faith. The record suggests that plaintiffs were attempting to game the system and obtain reimbursement for their son's private school education. *See Thies v. N.Y.C. Bd. of Educ.*, 2008 WL 344728, at *4 (S.D.N.Y. Feb. 4, 2008) (denying reimbursement

because plaintiffs "demonstrated they did not seriously intend to enroll [their child] in public school" by selecting a private school "without first fulfilling their obligation to work together with school officials to find a placement that was appropriate"); *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 661 (S.D.N.Y. 2005) ("Obviously what went on here was the parents decided to send a trouble son to a private school . . ., found a school they liked (with no regard whatever for what his special needs might be, because there had as yet been no assessment and no determination about his needs), got their son accepted at the school, and then took steps to try to get the District to pay for the boy's private education.").

## 2. Lack of Notice

The DOE also argues that plaintiffs did not provide the requisite notice necessary to obtain reimbursement under 20 U.S.C. § 1412(a)(10)(C)(iii)(aa)-(bb). Def.'s Mem. of Law 23-25. Section 1412 provides that the tuition reimbursement for a parental placement "may be reduced or denied if

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa)."

It appears that neither provision applies in this case because the plaintiffs were not notified of J.P.'s exact placement until August 27, 2008. At that time, J.P.'s mother within 7 days wrote a letter to the DOE notifying them that (1) she planned to visit the Life Sciences class to determine its appropriateness for J.P., and (2) in the interim, J.P. would attend York. Eleven days later, she notified the DOE that J.P. would not be attending Life Sciences and stated her reasons for

rejecting this placement. The notice plaintiffs provided the DOE here of J.P.'s attendance at York appears more than sufficient, given when DOE notified them of its placement offer. Although § 1412 is not implicated here, plaintiffs' request for reimbursement should be denied because their actions indicate that they never intended to send J.P. to a public school and initiated this process to obtain public funding for his private education.

## CONCLUSION

Plaintiffs' motion for summary judgment is denied and the defendant's cross-motion for summary judgment is granted.

**SO ORDERED.**

Brooklyn, New York
February 2, 2012

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge